IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **MEDITAB SOFTWARE, INC.**, a California corporation, and **KALPESH PATEL**, <br><br> Plaintiffs, <br><br> v. <br><br> **PHARMACY SOFTWARE HOLDINGS, LLC**, a Utah limited liability company, and **SUITERX, LLC** a Delaware limited liability company, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Case No. 2:20-cv-33 <br><br> Judge Clark Waddoups |

Before the court is a Motion for Partial Summary Judgment (ECF Nos. 39, 40) filed by Plaintiffs Meditab Software, Inc. and Kalpesh Patel ("Meditab"). Defendants Pharmacy Software Holdings, LLC and SuiteRx, LLC (collectively "Pharmacy") oppose Meditab's motion, arguing that material facts exist and prohibit Meditab from being granted the relief it seeks and that the court should defer ruling until a full record is developed through discovery. Meditab's Motion has been fully briefed, and the court heard argument on the same at a hearing held on June 23, 2020. After due consideration of the parties' filings and oral arguments, and otherwise being fully advised, **IT IS HEREBY ORDERED** that Meditab's motion is **DENIED**.

## BACKGROUND

This dispute arises out of the parties' Membership Interest Purchase Agreement (the "MIPA") dated March 1, 2019 (ECF No. 40-1). While the details of this agreement are intricate, for purposes of Meditab's Motion, the court recognizes the following undisputed material facts:

1.  under the MIPA, Pharmacy agreed to purchase Meditab's roughly 64% ownership interest in SuiteRx LLC (ECF No. 40-1 at 3);

2.  as part of the MIPA, the parties also entered into an Intellectual Property Purchase Agreement (the "IPPA") (ECF No. 24-2) whereby Meditab agreed to sell certain assets, which included relevant software used by pharmacies to facilitate delivery of prescription medications (the "Purchased Assets"), in exchange for the payments outlined in the MIPA;

3.  the MIPA provided that Pharmacy would pay Meditab a total of $3,000,000, through three scheduled cash payments (that totaled $2,500,000) and a promissory note of $500,000 (the "Note") (*See* ECF No. 40-1 at 7–8);

    a.  The Note required that Pharmacy make quarterly payments of $31,250 to Meditab over a period of four years, commencing on January 1, 2020 (*See* ECF No. 40-1 at 7–8);

4.  the MIPA contained two restrictive covenants (the "Restrictive Covenants"), in Section 5.8, one of which precluded certain solicitation of clients and customers, and the other precluded employing or soliciting certain officers, managers and/or employees (*See* ECF No. 40-1 at 18);

5.  the MIPA provided, in Section 8.4, that if Pharmacy failed to make its cash payments to Meditab "in accordance with the deadlines set forth" and if Meditab has not breached the agreement, then Meditab "shall be entitled to (i) revoke [Pharmacy's] ownership of the [Purchased Assets] that it received pursuant to the [IPPA] and (ii) the [Restrictive Covenants] shall automatically be of no further force or effect" (*See* ECF No. 40-1 at 24);

6. under the MIPA, Pharmacy was required to make the following cash payments: $500,000 on or before March 1, 2019, $500,000 on or before April 15, 2019, and $1,500,000 on or before May 30, 2019. The MIPA also required Pharmacy to deliver a Note to Meditab in the amount of $500,000 on March 1, 2019 (*See* ECF No. 40-1 at 7–8);

7. Pharmacy timely executed the Note and made the first two payments of $500,000; however, Pharmacy failed to timely make the May 30, 2019 cash payment of $1,500,000;

8. to resolve the late payment, the parties entered into a First Amendment to Membership Interest Purchase Agreement (the "Amendment") (ECF No. 40-2), effective June 21, 2019, that modified the MIPA's payment schedule to require:

   a. a $200,000 payment by June 25, 2019, with the remaining $1,800,000 due to bear a 6% annual interest rate compounded and payable monthly with a $9,000 interest payment due by July 1, 2019 (ECF No. 40-2 at 2);

   b. a $300,000 payment due by July 19, 2019, with the remaining $1,500,000 due to bear a 6% annual interest rate compounded and payable monthly with $7,500 interest payments due by August 1, 2019, September 1, 2019, October 1, 2019, and November 1, 2019 (ECF No. 40-2 at 2–3);

   c. a $500,000 payment due by November 1, 2019 (the "November 1 Payment"), with the remaining $1,000,000 due to bear a 12% annual interest rate compounded and payable monthly with $10,000 interest payments due by December 1, 2019, January 1, 2020, February 1, 2020, March 1, 2020, and April 1, 2020 (ECF No. 40-2 at 3); and

    d. the final payment of $1,000,000 due by April 1, 2020 (ECF No. 40-2 at 3).[1]

9. the Amendment required all payments to be made by wire (ECF No. 40-2 at 2–3);

10. the Amendment also modified Section 8.4 of the MIPA to delete the requirement that Meditab not be in breach of the agreement before it can revoke Pharmacy's ownership of the Purchased Assets or declare the Restrictive Covenants null and void in response to Pharmacy failing to make scheduled payments (ECF No. 40-2 at 3);

11. neither the MIPA nor the IIPA contain a time is of the essence clause (*See* ECF Nos. 40-1 & 40-2);

12. the MIPA is governed by Delaware law (ECF No. 40-1 at 25);

13. while the Amendment states that Pharmacy's failure to make "timely payments of any sums when due under this Agreement" will constitute an "Event of Default," neither the MIPA or IIPA, nor the Amendment, defines the consequences of an Event of Default. (*See* ECF No. 40-2 at 3). The consequences of an "Event of Default" are only defined in the Note, which states that upon an Event of Default, Meditab may "(i) charge a late fee in the amount of $1,000 per late payment and (ii) declare this Note and the principal on this Note . . . due and payable." (*See* ECF No. 40-1 at 32);

14. Pharmacy appears to have made all scheduled principal and interest payments under the Amendment until the November 1 Payment [2];

---

[1] The Amendment is silent as to the Note originally required by the MIPA, and the $500,000 pledged by the Note does not appear to be included in the Amendment's restructuring of the $2,000,000 that Pharmacy still owed to Meditab under the MIPA at the time the parties entered into the Amendment. (*See* ECF No. 40-2 at 2–3). As discussed below, the parties do not address the status of the Note and whether it was intended to be forgiven under the Amendment.

[2] Pharmacy was one week late on its July 1, 2019 interest payment of $9,000, but the parties agreed to a late payment fee of $500 to remedy the minor breach. (*See* ECF No. 40-3 at 84–88). It does not appear that Pharmacy includes this $500 payment in its calculation that to date it has paid Meditab a total of $1,539,000. (*See* ECF No. 54 at ¶ 22). Under the MIPA and Amendment, the sum of the principal and interest payments due from March 1, 2019 through November 1, 2019 (but not including the $500,000

15. On October 31, 2019, Pharmacy contacted Meditab to attempt to postpone, by six months, the $500,000 principal payment due on November 1, 2019. (ECF No. 40-5 at 2). Meditab declined the request and on November 4, 2019, sent Pharmacy a Notice of Breach that informed Pharmacy that it considered Pharmacy in breach of the MIPA and Amendment and that it "reserves all its respective rights to proceed to enforce its rights and remedies at any time," specifically referencing Section 8.4 of the MIPA, as modified by the Amendment (ECF No. 40-3 at 89–94). Then, on November 5, 2019, Meditab sent Pharmacy a second letter stating that it intended to enforce Section 8.4 of the MIPA, as modified by the Amendment, and demanding that Pharmacy, among other things, stop using the Purchased Assets and return the same to Meditab (ECF No. 40-3 at 95–100);

16. Thereafter, on November 7, 2019, Pharmacy wired $500,000 to MedPharm Services, LLC, but on November 11, 2019, Meditab reversed the wire because "the funds do not belong to MedPharm Services, LLC" and because it "had already provided notice of default" (see Complaint, ECF No. 2 at ¶ 56);

17. Pharmacy subsequently made the scheduled interest payments of $10,000 on December 1, 2019 and January 1, 2020, and Meditab retained those payments until after the court's January 31, 2020 hearing on Meditab's Motion for Temporary Restraining Order; and

18. To date, Pharmacy has paid Meditab a total of $1,539,000. (ECF No. 40-4 at ¶ 17). This total does not include the November 1 Payment of $500,000 or the December 1,

---

principal payment due on that date) is $1,539,000. (*See* ECF No. 40-4 at ¶ 17).

2019 and January 1, 2020 interest payments of $10,000 each, as Meditab returned each of those payments to Pharmacy.[3]

Based on these facts, Meditab asks the court to grant it summary judgment, and declaratory judgment,[4] on three issues: 1) that Pharmacy failed to make a payment as required by its agreement with Meditab; 2) that as a result of Pharmacy's failure to pay, ownership of the Purchased Assets was and is revoked from Pharmacy and reverted back to Meditab; and 3) that as a result of Pharmacy's breach, the Restrictive Covenants are now void and of no effect.[5]

## **DISCUSSION**

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(A). A material fact is one that may affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id.* The court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001).

Meditab's Motion is predicated on its assertion that Pharmacy materially breached the

---

[3] *See supra*, note 2.

[4] Meditab also argues that if its Motion is granted, the court should award it a preliminary injunction ordering Pharmacy to surrender to it the Purchased Assets at issue in this litigation.

[5] Meditab moved for expedited briefing on its Motion (ECF No. 41), which the court denied on April 1, 2020 for the same reasons the TRO was denied—because there is no reason "why this case can't be resolved over the normal course of time." (ECF No. 47).

MIPA by failing to make the November 1 Payment by the due date stated in the Amendment. Meditab argues that as a result of this breach, and pursuant to the terms of the MIPA as amended, the Purchased Assets reverted to Meditab and the Covenants and Restrictions became void. Pharmacy acknowledges that it failed to make the November 1 Payment by its due date but asserts that Meditab had already materially breached the MIPA by not fully delivering the Purchased Assets to it. Pharmacy argues that questions exist as to whether its failure to make the November 1 Payment by its due date was a material breach of the MIPA and whether Meditab was the first to breach the MIPA and that such questions preclude summary judgment from being granted. The court agrees.

    **I.**     **Material questions of fact exist as to whether the due dates set forth in the Amendment required strict compliance and whether Pharmacy's failure to make the November 1 Payment by its due date was a material breach of the MIPA.**

Meditab's argument that Pharmacy's failure to make the November 1 Payment by the scheduled due date constituted a material breach of the MIPA presupposes that time was of the essence for the MIPA. *See* 15 WILLISTON ON CONTRACTS § 46:2 (4th 2000) ("When it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party at or within the time specified in the contract is essential in order to enable that party to require performance from the other party. It does not simply mean delay will give rise to a right of action against that party, although the breach of any promise in a contract, including one dealing with the time of performance, will have that effect. Nor does that phrase merely mean that performance on time is a material matter, but rather, that it is so material that exact compliance with the terms of the contract in this respect is essential to the right to require counter-performance."). However, as recognized above, neither the MIPA nor the Amendment contains a time is of the essence clause.

7

Under Delaware law, which governs the agreements here, "[w]hen a contract does not contain a time of the essence clause, courts [must] look to the surrounding circumstances to determine whether the parties intended strict compliance with a particular timeframe." *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *10 (Del. Ch. May 2, 2007). Meditab argues that by stating that Pharmacy's failure to make the scheduled payments on their due dates would constitute an Event of Default, the Amendment made it clear that the parties clearly intended strict compliance with the deadlines set forth therein. But the Amendment does not, on its face, strictly requirement payments to be made on their due dates; rather, it states that payments must be made "timely payments . . . when due." (*See* ECF No. 40-2 at 3). Even assuming that this language indicated that the parties intended the payment dates to be strictly followed, it is not determinative of the issue, as other "surrounding circumstances," and namely the parties' history of interactions, indicate a trend of flexibility in the application of those due dates. Before Pharmacy failed to make the November 1 Payment on its due date, it had twice failed to make scheduled payments on their due dates, and both times, their failures were forgiven. First, Pharmacy was late on its May 30, 2019 cash payment of $1,500,000, a delay that was cured by the parties entering into the Amendment. Then, less than two weeks after the Amendment was made effective, Pharmacy failed to make its July 1, 2019 interest payment of $9,000. Again, Meditab forgave Pharmacy's lateness and agreed to accept a late payment fee of $500 as a remedy. (*See* ECF No. 40-3 at 84–88). Based on these undisputed facts, the court cannot, at this point, conclude as a matter of law that the parties intended strict compliance with the Amendment's payment deadlines. As such, the court cannot determine that time was of the essence in the MIPA, and thus cannot conclude that Pharmacy's failure to make the November 1 Payment by its due date was, on its face, a material breach of the MIPA.

Under Delaware law, "'where the language of a contract does not contain a specific declaration that time is of the essence, the law permits the parties a reasonable time in which to tender performance.'" *Bramble Const. Co. v. Exit Realty, LLC*, No. CIV.A. 08C05234WCC, 2009 WL 3069686, at *5 (Del. Super. Ct. Aug. 27, 2009) (quoting *Brasby v. Morris*, No. C.A. 05C-10-022-RFS, 2007 WL 949485, at *3 (Del. Super. Ct. Mar. 29, 2007)). Here, Pharmacy made its November 1 Payment six days after its due date. Thus, by asking the court to find, as a matter of law, that this delay constituted a material breach of the MIPA, Meditab asks the court to determine that a six-day delay was unreasonable. Delaware courts have expressly recognized that such an inquiry "is ordinarily a question of fact and thus often inappropriate for resolution at the summary judgment stage." *HIFN, Inc.*, 2007 WL 1309376, at *10. Indeed, determining whether a breach is material requires a court to consider, among other things, "the extent to which the injured party will be deprived of the benefit which he reasonably expected," "the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived," and "the extent to which the party failing to perform or to offer to perform will suffer forfeiture." *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) (quoting Restatement (Second) of Contracts § 241). Such inquiries are simply beyond that which can be conducted on the record before the court; more facts are needed. The question of whether Pharmacy's delay in making the November 1 Payment constituted a material breach of the MIPA may affect the outcome of the litigation and is therefore a material question of fact that precludes this court from granting summary judgment in Meditab's favor. *See Anderson*, 477 U.S. at 248.

## II. A material question of fact exists as to whether Meditab first breached the MIPA.

Pharmacy asserts that before it failed to make the November 1 Payment by its due date, Meditab was already in breach of the MIPA, as it had failed to deliver to Pharmacy coding that was necessary to allow the purchased software to fully function and failed to disclose to Pharmacy defects in the purchased software of which Meditab was aware. Pharmacy thus argues that because Meditab was the first to breach the MIPA, it cannot now attempt to use Pharmacy's failure to make the November 1 Payment by its due date as a basis for canceling the agreement.

Meditab argues that Pharmacy's assertions are irrelevant for two reasons. First, because Pharmacy waived their ability to claim that Meditab first breached the MIPA when it entered into the Amendment revising Section 8.4 to delete the requirement that Meditab not be in breach of the agreement before it can revoke Pharmacy's ownership of the Purchased Assets or declare the Restrictive Covenants null and void in response to Pharmacy failing to make scheduled payments. (*See* ECF No. 40-2 at 3). And second, because Pharmacy waived this first-to-breach argument by continuing to perform under the MIPA, by making scheduled payments, after it knew that the software was allegedly defective.

Meditab's arguments raise more questions than they answer. As Pharmacy points out, the Amendment did not contain a release of prior claims or breaches, but instead only amended "certain terms to the [MIPA]" and expressly states that "[a]ll the provisions, terms and conditions of the [MIPA] that were not modified by this Amendment, remain valid, with all legal force between the parties and unaltered." (*See* ECF No. 54-1 at 30–31). Thus, it is unclear whether by modifying Section 8.4, the Amendment intended to waive, and actually did waive, Pharmacy's ability to assert claims for any then-existing or unknown breaches. Further, Meditab's argument that Pharmacy waived its ability to assert a breach by continuing to perform

10

under the contract also raises questions as to whether Meditab itself has waived its ability to pursue a claim that Pharmacy breached the MIPA by not timely making the November 1 Payment, as Meditab continued to accept two payments from Pharmacy—the $10,000 interest payments made on December 1, 2019 and January 1, 2020—after it knew that Pharmacy failed to make that payment (and formally notified Pharmacy that it was in breach). Such unanswered questions cannot be resolved by the record before the court. Rather, they are material questions of fact that require further development and thus preclude summary judgment from being granted in Meditab's favor.

### III.  A material question of fact exists as to whether the Note is still in effect.

As discussed above, the Amendment is silent as to the Note originally required by the MIPA, and the $500,000 pledged by that Note is not included in the Amendment's restructuring of the $2,000,000 that Pharmacy still owed to Meditab under the MIPA at the time the parties entered into the Amendment. (*See* ECF No. 40-2 at 2–3). Because the Amendment neither forgives, not incorporates the sums owed by, the Note, it is unclear, at this point in the litigation, whether the Note is still in effect.

This discrepancy is material, because, as noted above, the consequences of an "Event of Default" are only defined in the Note. Meditab relies on that definition to argue that Pharmacy's failure to make the November 1 Payment by its due date constituted an event default. If the Note is no longer in effect, then that definition is, arguably, no longer controlling. Meditab is not entitled to summary judgment while this issue remains unresolved.

### IV.  Meditab cannot avoid these questions of material fact.

Meditab attempts to side-step the unanswered questions of fact discussed herein by arguing that they do not preclude an award of summary judgment because they are preempted by the Amendment. Specifically, Meditab relies on Section 8.4 of the Amendment, which expressly

states that if Pharmacy fails "to deliver the Cash Consideration to the Seller in accordance with the deadlines set forth in Section 2.2, then the Seller shall be entitled to (i) revoke the Purchaser's ownership of the Intellectual Property that it received pursuant to the IP Purchase Agreement; and (ii) the covenants set forth in Section 5.8 shall automatically be of no further force or effect." (*See* ECF No. 40-2 at 2–3). Meditab argues that the court need not look any further than this language. But this argument is simply a repackaging of Meditab's "time is of the essence" argument, and it fails for the same reason—if the MIPA did not require strict compliance with the due dates set forth in the Amendment, which as discussed above, the court cannot determine at this stage that it did, Pharmacy's failure to meet those deadlines did not necessarily trigger Section 8.4. As discussed above, such a determination cannot be made without a further development of facts.

## CONCLUSION

As discussed herein, at least four genuine issues of material fact exist in this dispute: whether the MIPA required strict compliance with the due dates set forth in the Amendment, whether Pharmacy's failure to make the November 1 Payment by its due date was a material breach of the MIPA, whether Meditab waived its ability to assert a claim for breach against Pharmacy, either because it was the first to breach the MIPA or because it continued to perform under the MIPA after the alleged breach; and whether the Note is still in effect. The presence of such unanswered questions prohibit the court from granting Meditab the partial summary judgment it seeks. The case should proceed to discovery "over the normal course of time." (*See* ECF No. 27 at 24:1–5; ECF No. 47 at 2).

DATED this 14th day of July, 2020.

BY THE COURT:

_____

Clark Waddoups
United States District Judge